IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO. 05-60033-CIV-MARRA/SELTZER

TERRI MILSAP, individually and as the parent of
TRISTAN BEAL, and TERRANCE MILSAP,
DONNA WEISSINGER, individually and as parent
of STEPHANIE EMILY THOMPSON, ANTHONY
MICHAEL THOMPSON and JOSEPH STEPHEN
THOMPSON, JENNIFER TOOLEN individually and
as parent of ASHLEY TOOLEN and KAREN TOOLEN
and HOUSING OPPORTUNITIES PROJECT FOR
EXCELLENCE, INC.



     Plaintiffs

vs.

CORNERSTONE RESIDENTIAL MANAGEMENT, INC.,
SANCTUARY COVE ASSOCIATES, LTD. d/b/a
SANCTUARY COVE APARTMENTS, CORNERSTONE GROUP
HOLDINGS, INC., and CORNERSTONE GROUP DEVELOPMENT
CORP.

     Defendants

_____/

## AMENDED CLASS ACTION COMPLAINT

COMES NOW, Plaintiffs, TERRI MILSAP, individually and as the parent of TRISTAN BEAL,

and TERRANCE MILSAP, DONNA WEISSINGER, individually and as parent of

STEPHANIE EMILY THOMPSON, ANTHONY MICHAEL THOMPSON and JOSEPH

STEPHEN THOMPSON, JENNIFER TOOLEN individually and as parent of ASHLEY

TOOLEN and KAREN TOOLEN and HOUSING OPPORTUNITIES PROJECT FOR

EXCELLENCE, INC., by and through undersigned counsel and sues the Defendants,

CORNERSTONE GROUP, CORNERSTONE RESIDENTIAL MANAGEMENT, INC.,

SANCTUARY COVE ASSOCIATES, LTD. d/b/a SANCTUARY COVE APARTMENTS,



CORNERSTONE GROUP HOLDINGS, INC., and CORNERSTONE GROUP DEVELOPMENT CORP., and states as follows:

1. This Court has original jurisdiction over the action pursuant to 28 U.S.C. § 1331 and 1343 for plaintiff's claims arising under the Fair Housing Act ("FHA"),42 U.S.C. §§ 3604, et seq., Declaratory Judgment Act, 28 U.S.C. §2201, and supplemental claims jurisdiction pursuant to 28 U.S.C. § 1367.

2. Venue is proper in the Southern District of Florida, Ft. Lauderdale Division, under 28 U.S.C. § 1391(b) because the claim arose in this judicial district.

3. The Plaintiff, TERRI MILSAP, is a single mother of two young boys, Plaintiff TRISTAN BEAL, age 3, and Plaintiff TERRANCE MILSAP, age 12, and presently lives, with her family, at 1021 Northeast 3rd Ave., Apt #6, Pompano Beach, FL and all Plaintiffs are otherwise *sui juris*.

4. The Plaintiff, DONNA WEISSINGER, is a single mother who lives with her a daughter, Plaintiff, STEPHANIE EMILY THOMPSON, age 14, and two young boys, Plaintiff ANTHONY MICHAEL THOMPSON, age 11, and, Plaintiff JOSEPH STEPHEN THOMPSON, age 9,and presently resides, at 7100 NW 21st St. in Sunrise, Broward County, Florida and all Plaintiffs are otherwise *sui juris*.

5. The Plaintiff, JENNIFER TOOLEN, is a single mother of two daughters, parent of Plaintiff ASHLEY TOOLEN age 15, and Plaintiff KAREN TOOLEN, age 13, and presently lives at 5807 West McNab Rd., North Lauderdale, Florida, and all Plaintiffs are otherwise otherwise *sui juris*.

6. The Plaintiff, HOUSING OPPORTUNITIES PROJECT FOR EXCELLENCE, INC. (hereinafter H.O.P.E., Inc.), is a private fair housing, Florida not-for-profit, 501 (c) 3

Scanned Image - 0:05CV60033 Document 29 page 8 Fri Feb 25 13:38:10 2005

corporation established in 1988. H.O.P.E., INC. provides information about and seeks to enforce fair housing laws for the people of South Florida who have been denied housing of their choice. H.O.P.E., INC. accomplishes these goals by a three-tiered system of private enforcement, education outreach and counseling to achieve its mission to ensure fair and equal housing opportunities for all people. Its programs are designed to ensure that people are offered the right to select housing of their choice without discrimination based on race, religion, color, national origin, sex, disability, marital or familial status, or such other protected classes as may be conferred by federal, state or local laws. H.O.P.E., INC. is the only private not-for-profit fair housing organization in South Florida engaged in testing for fair housing law violations, and pursuing enforcement of meritorious claims.

7.      Defendants CORNERSTONE GROUP HOLDINGS, INC., CORNERSTONE GROUP DEVELOPMENT CORP.; and CORNERSTONE RESIDENTIAL MANAGEMENT, INC. are Florida corporations or Limited Liability Partnerships and are collectively known as and referred to herein as CORNERSTONE GROUP.

8.      The Defendant, CORNERSTONE RESIDENTIAL MANAGEMENT, INC. (hereinafter CORNERSTONE RESIDENTIAL) is a Florida Corporation, licensed to and doing business in Broward County Florida.

9.      According to their published information, CORNERSTONE GROUP was founded in 1993, and has since developed fifty-two (52) apartment communities in the State of Florida consisting of more than 15,000 multifamily rental and condominium units throughout Florida (over 8,000 in South Florida) and are now ranked as the 10th largest multifamily developer in the United States – the 5th largest in Florida -- by the National

Association of Home Builders.

10. These apartment communities are low-income rental housing. In exchange for valuable consideration, CORNERSTONE GROUP agreed to develop and maintain such low income rental housing in compliance with regulations promulgated under Section 8 of the United States Housing Act of 1937, Section 42 of the Internal Revenue Code of 1986, the rules and regulations of the Florida Housing Finance Corporation Act, §§ 420.501-420.516, in addition to the requirements of the Florida and Federal Fair Housing Act.

11. Pursuant to information and belief, the following CORNERSTONE GROUP low income housing with its predominant focus in this judicial district as follows:

    a. In Miami-Dade County, the low income housing owned and operated by CORNERSTONE GROUP is as follows:

        i. Alhambra Cove,

        ii. Boca Pointe, 164 units

        iii. Bonita Pointe,

        iv. Center Court – Miami, 589 units

        v. Crossing at University, 320 units

        vi. Doral Terrace Apartments, 256 units

        vii. Eagle Landry, 321 units

        viii. Golden Oaks, 280 units

        ix. Hibiscus Point, 212 units

        x. Hidden Cove – Miami, 144 units

        xi. Marbrissa d/b/a Marbrissa Lake, 368 units

        xii. Olympia Building, 80 units

xiii.  River Oaks, 160 units

xiv.  Siesta Pointe, 392 units,

xv.  Spinnaker Cove, 220 units,

xvi.  Tuscany Place, 340 units,

xvii.  Villa Esperanza, 192 units,

xviii.  Villa Hermosa, 76 units.

b.  In Broward County, the low income housing owned and operated by CORNERSTONE GROUP is as follows:

i.  Banyan Pointe, 300 units

ii.  Bridgewater Place, 312 units

iii.  Cross Keys, 82 units

iv.  Cross Keys II, 240 units

v.  Eagle Point, 192 units

vi.  Huron Pointe, 200 units

vii.  Oaks at Pompano, 224 units

viii.  Sanctuary Cove, 292 units

ix.  St. Croix, 246 units

c.  In Palm Beach County, the low income housing owned and operated by CORNERSTONE GROUP is as follows:

i.  Indian Trace, 330 units

ii.  Laguna Pointe, 188 units

iii.  Lantana, 94 units,

iv.  Logan's Pointe, 248 units,

  v.   Porto Fino, 270 units,

  vi.   Renaissance, 344 units.

d.   In Lee County the low income housing owned and operated by CORNERSTONE GROUP is as follows:

  i.   Bernwood Trace, 340 units,

  ii.   Hawks Landry.

e.   In Brevard County the low income housing owned and operated by CORNERSTONE GROUP is Mission Bay, with 360 units.

f.   In Manatee County the low income housing owned and operated by CORNERSTONE GROUP is Oaks at Ellenton, with 168 units

g.   In St. Lucie County the low income housing owned and operated by CORNERSTONE GROUP is Sabal Chase, with 340 units.

h.   In Volusia County, the low income housing owned and operated by CORNERSTONE GROUP is as follows:

  i.   Carolina Club, 224 units,

  ii.   San Marco, 260 units.

i.   In Hillsborough County, the low income housing owned and operated by CORNERSTONE GROUP is as follows:

  i.   Bristol Bay, 300 units,

  ii.   Clipper Bay, 276 units,

  iii.   Clipper Cove, 176 units,

  iv.   Cypress Trace, 348 units,

  v.   Grove Pointe, 80 units,

       vi.  Mariner's Cove, 208 units

   j.  In Duval County, the low income housing owned and operated by CORNERSTONE GROUP is as follows:

       i.  Mission Pointe, 388 units,

       ii.  Sundance Pointe, 288 units.

12. As far as available low-income housing, CORNERSTONE GROUP is required to and presents amenities that are extraordinary, and similar new low-income housing is not available for Plaintiffs or others similarly situated. Such amenities that CORNERSTONE GROUP is required by their agreement with their governmental financers include as follows:

   a.  Air conditioning in all units

   b.  Window Treatments

   c.  Termite prevention

   d.  At least two full bathrooms in all 3 bedroom units, and 1.5 bathrooms in 2 bedroom units

   e.  Bathtub with shower in at least one bathroom

   f.  Cable or satellite TV hook-up in all units

   g.  NEW range, oven, dishwasher, garbage disposal and refrigerator in all units

   h.  Exterior lighting in open and common areas

   i.  Exercise Room with appropriate equipment

   j.  Community Center or Clubhouse

   k.  Gated community with "carded" entry or security guard

   l.  Playground/tot lot

m. Swimming pool

n. Laundry facilities

o. Ceiling fans

p. Providing Welfare to Work or Self-Sufficiency Programs

q. Providing Homeownership Opportunity Programs

r. Providing First time Homebuyers Seminars

s. Providing regularly scheduled classes in keyboarding, computer literacy, secretarial skills or other useful job skills.

t. Providing quarterly visits by health care professionals which include health screening, flu shots, vision and hearing tests.

u. Providing resident activities that bring the residents together and encourage community pride such as parties, picnics and children's functions.

v. Providing health and nutrition classes for at least eight hours per year

w. Providing a computer lab with at least six computers, printer, and educational, word processing, spreadsheet and entertainment functions.

13. CORNERSTONE GROUP reports that in 2004, their profitable and strategic growth led to a near doubling in the size of our workforce and corporate facilities. CORNERSTONE GROUP has more than 370 employees system-wide, gross annual revenues approaching $200 million, and a development/management real estate portfolio aggregately valued at almost $1 billion.

14. According to their published information, CORNERSTONE GROUP sets exceptional, but attainable, standards for their communities in every market they enter and always provide superior amenities and management. CORNERSTONE GROUP has consistently

Scanned Image - 0:05CV60033 Document 29 page 14 Fri Feb 25 13:38:19 2005

delivered excellent, highly stable, low-risk returns to its corporate investors.

15.     Defendants CORNERSTONE RESIDENTIAL and CORNERSTONE GROUP are
related companies and an they are an integrated enterprise that owns and operates all of
its over 50 apartment communities through jointly owned corporations and limited
partnerships; however, all control and decision making for each and every corporation is
from Cornerstone Group.  This integrated enterprise has (1) an interrelation of operations,
(2) centralized control of labor operations, (3) common management, and (4) common
ownership or financial control.

16.     The Defendant, SANCTUARY COVE ASSOCIATES, LTD. d/b/a SANCTUARY
COVE APARTMENTS (hereinafter SC APARTMENTS) is a Florida Limited
Partnership part of the integrated enterprise with CORNERSTONE GROUP, licensed to
and doing business in Broward County Florida.

**CLASS ALLEGATIONS**

17. This case involves four (4) separate classes.  Class Two is a subclass of Class One.
Class Four is subclass of Class Three.

    a.  Class One is defined as all families who were denied, or otherwise discriminated
    against, in their efforts to obtain housing at a Cornerstone Group developed or
    managed housing facility due to the number of people in and/or the composition
    of their family and who do not presently reside in a Cornerstone Group developed
    or managed housing facility.

    b.  Class Two is defined as all families who were denied, or otherwise discriminated
    against, in their efforts to obtain housing at Sanctuary Cove Apartments due to
    number of people in and/or the composition of their family and who do not

Scanned Image - 0:05CV60033 Document 29 page 15 Fri Feb 25 13:38:21 2005

presently reside in Sanctuary Cove.

   c.  Class Three is defined as all families who currently reside in a Cornerstone Group developed or managed housing facility and were steered to larger and more expensive units because of the number of persons in or the composition of their household.

   d.  Class Four is defined as all families who currently reside in Sanctuary Cove and were steered to larger and more expensive units because of the number of children in or the composition of their household.

18.   The members of each class are so numerous that joinder of all such persons is impracticable and the disposition of their claims in a class action is a benefit to the parties and to the Court. The time periods applicable to the claims asserted herein are the maximum periods allowed under the applicable Statues of Limitations.

19.   There is a well defined community of interest in the questions of law and fact involved affecting the parties to be represented in that they were all subject to the common discriminatory policies and procedures that discriminate against families with children in violation of the Fair Housing Act.

20.   Common questions of law and fact predominate. Among the common questions of fact is the legitimacy of restrictive occupancy standards for each development, as set by the Defendants, forcing families with more than one child into larger units or other developments and the use of more restrictive requirements in order to screen out occupants. Common question of law are extremely limited and include the application of U.S. Department of Housing and Urban Development Regulations regarding occupancy standards and defenses related thereto. Similarly, the claims and defenses to

Scanned Image - 0:05CV60033 Document 29 page 16 Fri Feb 25 13:38:22 2005

be raised by and against the parties herein are typical of the claims or defenses which would be raised by the members of the classes if they were a party to this action.

21.    The relief sought herein is for the benefit of all members of the classes and consistent injunctive relief and damages should be provided for each injured party who has suffered on account of the Defendants' failure to comply with law.

22.    Prosecution of this matter by individual members of the class would only create a risk of inconsistent and varying adjudications and the establishment of incompatible standards by Defendants.

23.    The individual Plaintiffs will fairly and adequately protect the interests of the class they seek to represent. They are committed to vigorously litigating this matter.  To that end, they have retained counsel experienced in handling class claims.  Neither Plaintiffs nor their counsel have any interest that might cause them not to vigorously pursue this claim.

24.    A class action is a superior method for the fair and efficient adjudication of this controversy and these claims should be certified pursuant to Rule 23(b)(1) and 23(b)(3), Federal Rules of Civil Procedure.

25.    References to Plaintiffs shall be deemed to include the named Plaintiffs and each member of the class, unless otherwise indicated.

**FACTS AS TO CLASS REPRESENTATIVES**

26.    Sanctuary Cove is a development owned by Defendant SC APARTMENTS and managed by CORNERSTONE RESIDENTIAL. Sanctuary Cove is a 292-unit multifamily rental community located at 5301 West McNab Road, North. Lauderdale, Florida. A former miniature golf area, the Mediterranean-styled community houses 13 buildings and a clubhouse on 17 acres.

27.     As a management company, CORNERSTONE GROUP, is the disclosed agent for the owners of said property, SC APARTMENTS, and as such, each of the individual Defendants in taking the actions alleged in the Complaint were the agents, principals, or co-conspirators of one another. Whenever and wherever reference is made in this Complaint to any acts of the Defendants, such allegations and references shall also be deemed to mean the acts by each of the Defendants acting individually, jointly or severally.

28.     The Fair Housing Act was amended in 1988 to prohibit, *inter alia,* housing practices that discriminate on the basis of familial status. 42 U.S.C. §§. 3601-19. "Familial status," as relevant to this case, is defined by the Act as "one or more individuals (who have not attained the age of eighteen years) being domiciled with ... (1) a parent or another person having legal custody of such individual or individuals...... *Id.* at § 3602(k); 24 C.F.R. § *100.20.*

29.     Plaintiff TERRI MILSAP, is a single mother of two young boys who is "low income tenant" within the meaning of 26 U.S.C. § 42(g)(1).

30.     Due to her income, MILSAP was eligible for a Section 8 federal rental assistance voucher for a two-bedroom unit for MILSAP and her boys. MILSAP waited for five years to obtain a Section 8 voucher; however, MILSAP was required to use the voucher to obtain housing in a short period of time, upon the expiration of such time, such voucher would be worthless.

31.     On or about 3:30 P.M. on Tuesday, October 19, 2004, TERRI MILSAP went to Sanctuary Cove, located at 5301 West McNab Road, to determine whether there were apartments available for her and her family.

32. Upon entering the premises, MILSAP found a document on the front desk entitled "Rental Standards", a true and correct copy of which is attached hereto as Exhibit "A".

33. The policy published by the Defendants is as follows: "Our management company has established the following limits on occupancy at Sanctuary Cove Apartments:

| | |
|---|---|
| One Bedroom: | Maximum of Two (2) people (2 adults) |
| Two Bedroom: | Maximum of Three (3) people (couple, & 1 heart beat per room) |
| Three Bedroom: | Maximum of Four (4) people (couple, & 1 heart beat per room) |

34. At this time, MILSAP became upset and spoke with a representative from CORNERSTONE MANAGEMENT. She explained that because of the additional rules at Sanctuary Cove, she did not qualify for housing because she had a 2 bedroom voucher.

35. The representative asked MILSAP how many people would be in the apartment. When MILSAP said three, "me and my two boys", the representative said that she would need a three bedroom. When MILSAP tried to argue that the State of Florida allows same sex children to share a room, the representative said that MILSAP still would not qualify for a two-bedroom.

36. Ms. MILSAP could not obtain a three bedroom, as she could not apply her Section 8 voucher to the three bedroom apartment.

37. At that time, MILSAP asked for a card for the person in charge, Jill DeBoy. MILSAP attempted to call Ms. DeBoy, but was told that Ms. DeBoy did not have an answering machine and to continue to try.

38. Because she could not rent an apartment at Sanctuary Cove, TERRI MILSAP had no option other than to accept less desirable housing for herself and her family.

39. Immediately after this incident, TERRI MILSAP went to H.O.P.E., INC. to complain about this discriminatory housing practice. H.O.P.E., INC. engaged four testers to

determine the validity of Ms. MILSAP's complaint.

40.    On Monday, December 13, 2004, Plaintiff DONNA WEISSINGER, picked up her three children, Stephanie, 14 years old, Anthony, 11 years old, and Joey, 9 years old, to see the Sanctuary Cove apartments at 3:15 P.M.

41.    When she arrived at Sanctuary Cove's rental office, Ms. WEISSINGER met with Defendants' agent, Mr. Louis Aguylar and asked if any three-bedroom apartments were available and he responded in the affirmative.

42.    When Mr. Aguylar saw Ms. WEISSINGER's children, he inquired whether the apartment was for her and all of her kids. After Ms. WEISSINGER responded, he said that she would not be able to live at Sanctuary Cove because she had "too many kids." He also stated that if she was married and had only two kids, she would be able to live there.

43.    When Ms. WEISSINGER asked why can she not live at Sanctuary Cove, Mr. Aguylar stated that "there could be only one heartbeat per bedroom." And that "Sanctuary Cove was built with government money and they have all kinds of rules, and having only one heartbeat per bedroom was one of them."

44.    Again, Mr. Aguylar stated that Ms. WEISSINGER had "too many kids" and attempted to steer Ms. WEISSINGER to another government-funded housing project that was in the process of being built.

45.    On December 21, 2004, DONNA WEISSINGER again inquired about the availability of a three bedroom and was told that there were still three bedrooms available. She then went to H.O.P.E., INC. to complain about this discriminatory housing practice.

46.    DONNA WEISSINGER and her children were on the verge of homelessness because of Defendant's acts.

47.  Subsequent to this Court's Order, CORNERSTONE GROUP denied her rental on two different grounds – first, WEISSINGER failed to have sufficient credit, and second, WEISSINGER made too much money.  CORNERSTONE GROUP failed to provide any notices pursuant to the Fair Credit Reporting Act.

48.  On or about 2:42 P.M., on October 21, 2004, a tester for H.O.P.E., INC., (hereinafter referred to as Tester 1), a single mother with two young daughters went to Sanctuary Cove to attempt to rent a two bedroom apartment.

49.  Tester 1 met with Mike, who advised her that although two-bedroom apartments were available, that other than a married couple sharing one room, only one person or child is allowed per room. In fact, Mike stated that the State of Florida passed a law that enforces us to rent only one heartbeat per room.

50.  On or about 2:45 P.M. on October 22, 2004, another tester for H.O.P.E., INC., (hereinafter referred to as Tester 2), a single mother of two young daughters went to Sanctuary Cove. When she went to the premises, she saw the Rental Standards on the front desk. The rental agent showed her floor plans of units. The rental agent reviewed the amenities and costs for each of the units.  When Tester 2 said that the two bedroom would be for only her and her two daughters, the rental agent said that each child must have their own bedroom due to the one heartbeat per room requirement.

51.  For a two bedroom, Tester 2 could not make more than $28,920.00 and the rent would be $ 836 per month. For the three bedroom, Tester 2 would be required to have an income of more than $26,400 per year and the rent would be $1,149 per month. When Tester 2 asked to see a three bedroom apartment, she was told that there were none available until November.

52.    On October 20, 2004, another tester for H.O.P.E., INC., (hereinafter referred to as Tester 3) conducted a phone test of the property from 10:15 to 10:30 in the morning. When he called he spoke with a sales representative named Clint. Clint advised that there were two bedroom/two bathroom, and three bedroom/two bathroom apartments available. When Tester 3 said that he had two daughters, Clint said that in order for Tester 3 to rent at Sanctuary Cove, he would need to rent a three-bedroom apartment.

53.    The Defendants and their agents, based upon the Plaintiffs' and the testers' familial status, refused to show Plaintiffs' available apartments, refused to negotiate with Plaintiffs on equal terms for the rental of an apartment, discouraged Plaintiffs and others similarly situated by publication of discriminatory regulations, steered Plaintiffs to other housing facilities, developed pretexts for failing to rent to families with children and otherwise discriminated against the Plaintiffs.

54.    Ms JENNIFER TOOLEN is a single mother with two children who presently resides at SANCTUARY COVE.    She moved in Sanctuary Cove on or about August 28, 2004. She initially requested a two bedroom and was told of the above policies and given a three bedroom apartment. She was promised housing at $780 rate for a three bedroom and then forced paid $880.

55.    Upon information and belief, and according to other testers used by H.O.P.E., other projects developed and managed by CORNERSTONE GROUP have similar housing occupancies, as follows:

a.    The onerous standard set by Sanctuary Cove, supra;

b.    Two people, three people and four people for one, two, and three bedroom apartments, respectively;

    c. Two people, three people and five people for one, two, and three bedroom apartments, respectively.

56. Such limitations on occupancy are less than the presumptively reasonable, "two-person per bedroom" guideline propounded by the U.S. Department of Housing and Urban Development.

57. CORNERSTONE GROUP bases its decision on an outdated and stereotypical conception of low-income project housing, and states that it implements occupancy standards to maintain the worth of the asset. Furthermore, the occupancy standards keep residents at the communities and preserve the "green space".

58. CORNERSTONE GROUP further implements policies that are demonstrate a discriminatory animus towards children and families with children as follows:

    a. In common areas, children may not use recreation, sports or hobby equipment, including, but not limited to toys, bikes, big wheels, mopeds, skateboards and roller skates is prohibited.

    b. No one shall play in the public halls, stairways or lobby ... Reasonable supervision must be exercised when children or adults who are not legally competent are outside the Resident unit.

59. As a result of CORNERSTONE GROUP being the 5th largest multi-family residential unit developer in the state of Florida, Defendants' discriminatory acts have had a pervasive and disparate impact on families with children.

60. Further, due to the demographic properties of minority families in South Florida, CORNERSTONE GROUP's policies have a further disparate impact on African-American and Hispanic families that value having more than one child per family.

61.    Defendants' actions described above constitute a pattern, practice, and policy of housing discrimination on the basis of familial status. In engaging in such activities, Defendants have acted intentionally or recklessly violated Plaintiffs' civil rights and damaged the rights and feelings of Plaintiffs MILSAP, WEISSINGER and TOOLEN and Plaintiff CHILDREN.

62.    Notwithstanding the preliminary injunction in place, Defendants continue to engage in the unlawful acts and the pattern or practice of discrimination described above. Plaintiffs have no adequate remedy at law. Plaintiffs are now suffering and will continue to suffer irreparable injury from defendants' acts and pattern or practice of discrimination based on familial status unless this Court provides further relief.

63.    As a result of Defendants' actions described above, Plaintiffs WEISSINGER and MILSAP and their children suffer and continue to suffer irreparable loss and injury including, but not limited to humiliation, embarrassment, emotional distress, and deprivation of their right to equal housing opportunities regardless of familial status. WEISSINGER and MILSAP and their children suffer actual damages including, but not limited to, not being able to find adequate housing and homelessness. WESSINGER and MILSAP and their children suffer actual damages including, but not limited to, continuing to reside of a residence out of necessity that is not equivalent to the residence offered by Sanctuary Cove.

64.    As a result of Defendants' actions described above, Plaintiff TOOLEN and her children suffer and continue to suffer irreparable loss and injury including, but not limited to humiliation, embarrassment, emotional distress, and deprivation of their right to equal housing opportunities regardless of familial status. Plaintiff TOOLEN and her children

suffer actual damages including, but not limited to, having paid and continuing to pay more money for a larger unit than was necessary.

65. In addition, Defendants' discriminatory actions have (a) interfered with the efforts and programs of Plaintiff H.O.P.E., INC. intended to bring about equality of opportunity to minorities and others in housing; (b) forced H.O.P.E., INC. to devote scarce resources to identify and counteract defendant's unlawful housing practices; and (c) interfered with the rights of H.O.P.E., INC.'s constituents in South Florida to enjoy the benefits of living in an integrated community and thereby frustrating H.O.P.E., INC.'s mission and purpose.

66. Any other conditions precedent to the filing of this action have been satisfied, or have been waived.

67. The Plaintiffs have retained the Law Offices of Matthew W. Dietz, Esq. and have agreed to pay them a reasonable fee for their services.

## A.   VIOLATION OF THE FEDERAL AND FLORIDA FAIR HOUSING ACTS

68. The Plaintiffs reallege and incorporate by reference paragraphs 1 through 67 as if alleged herein.

69. The foregoing conduct of Defendants constitutes discrimination against any person in the terms, conditions, and privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of familial status, is discriminatory and unlawful.

70. On September 13, 1988 Congress amended the Fair Housing Act to prohibit, *inter alia*, housing practices that discriminate on the basis of familial status. 42 U.S.C. §§ 3601 et seq. In amending the Act, Congress recognized that "families with children are refused

housing despite their ability to pay for it." H.R. Rep. No. 711, 100th Cong., 2nd Sess. (1988). In addition, Congress cited a HUD survey that found 25% of all rental units exclude children and that 50% of all rental units have policies that restrict families with children in some way. *See* Marans, *Measuring Restrictive Rental Practices Affecting Families With Children: A National Survey*, Office of Policy, Planning and Research, HUD, (1980). The HUD survey also revealed that almost 20% of families with children were forced to live in less desirable housing because of restrictive policies. Congress recognized these problems and sought to remedy them by amending the Fair Housing Act to make families with children a protected class.

71.  Families have suffered income stagnation coupled with enormous household debt. The most vulnerable families -- young families with children, single-parent families, and poor families -- have suffered serious declines in family income over the last decade. . . . The increasing demands in an already overwhelmed rental market have left millions of families stranded. A 1986 nationwide study found that 8 million low-income renters were competing for only 4 million affordable vacant units. As a result, more than one-third of the homeless are now families with children. In some cities, homeless families comprise almost 50 percent of the total homeless population.134 Cong. Rec. H4611 (daily ed. June 22, 1988) (statement of Rep. Miller).

72.  The Defendants violated the Act "by refusing to rent, or sell after the making of a bona fide offer, or refusing to negotiate for the rental or sale of, or otherwise made unavailable or denied, a dwelling based upon familial status," which act is prohibited by the statute that is codified at 42 U.S.C. § 3604(a) and the regulations that are found at 24 CFR §§ 100.60(a)(b)(2) and (4).

73. By printing and promulgating discriminatory occupancy standards for renting at Sanctuary Cove and all CORNERSTONE GROUP rental communities, the Defendants violated the Act "by making, printing or publishing, or causing to be made, printed or published statements and advertisements, with respect to the rental or sale of a dwelling that indicated a preference, limitation, or discrimination based on familial status," which act is prohibited by the statute that is codified at 42 U.S.C. § 3604(c) and the regulations that are found at 24 CFR § 100.75(b)(c)(1)(2).

74. Furthermore, the Defendants "engaged in unlawful conduct relating to the provision of housing which otherwise made unavailable or denied a dwelling to a person because of familial status," which violates the regulation found at 24 CFR § 100.50 (b)(3).

75. CORNERSTONE GROUP and Sanctuary Cove engaged in unlawful conduct such as steering by forcing families to obtain larger apartments than necessary, or steering to other facilities with less restrictive occupancy rules.

76. The Defendants violated the Act by "discriminat[ing] against any person in the terms, conditions, or privileges of sale or rental of a dwelling ... because of familial status ... 42 U.S.C. § 3604(b).

77. Defendants have injured Plaintiffs in violation of the Federal and Florida Fair Housing Act by committing the following discriminatory housing practices:

    a. Refusing to rent a dwelling because of familial status;

    b. Discriminating in the terms, conditions, and privileges of the rental of a dwelling because of familial status;

    c. Making and publishing statements with respect to the rental of a dwelling which indicated a preference, limitation, or discrimination based on familial status;

d.  Misrepresenting the availability of a rental opportunity because of familial status;

e.  Steering tenants into larger units because of their family status;

f.  Denying qualified Section 8 voucher holders housing because of the number of children in their households; and

g.  Steering tenants away from a housing development based upon familial status.

78.  Defendants' actions were in total and reckless disregard of Plaintiffs rights.

79.  As a result of Defendants' actions described above, Plaintiff MILSAP, WEISSINGER and their children, and all persons similarly situated suffer and continue to suffer irreparable loss and injury including, but not limited to humiliation, embarrassment, emotional distress, and deprivation of her rights to equal housing opportunities regardless of familial status.  MILSAP and WEISSINGER, their children, and all persons similarly situated suffer actual damages including, but not limited to, continuing to reside of a residence out of necessity that is not equivalent to the residences offered by CORNERSTONE GROUP.

80.  As a result of Defendants' actions described above, Plaintiff TOOLEN and her children, and all persons similarly situated suffer and continue to suffer irreparable loss and injury including, but not limited to humiliation, embarrassment, emotional distress, and deprivation of her rights to equal housing opportunities regardless of familial status. TOOLEN and her children, and all persons similarly situated suffer actual damages including, but not limited to, paying additional sums because of their familial status.

81.  In addition, Defendants' discriminatory actions have (a) interfered with the efforts and programs of Plaintiff H.O.P.E., INC. intended to bring about equality of opportunity to minorities and others in housing; (b) forced H.O.P.E., INC. to devote scarce resources to

identify and counteract defendant's unlawful housing practices; and (c) interfered with the rights of H.O.P.E., INC.'s constituents in South Florida to enjoy the benefits of living in an integrated community and thereby frustrating H.O.P.E., INC.'s mission and purpose.

WHEREFORE, Plaintiffs, TERRI MILSAP, DONNA WEISSINGER, JENNIFER TOOLAN, and their Children and HOUSING OPPORTUNITIES PROJECT FOR EXCELLENCE, INC., demand judgment against Defendants, CORNERSTONE RESIDENTIAL MANAGEMENT, INC., and SANCTUARY COVE ASSOCIATES, LTD. d/b/a SANCTUARY COVE APARTMENTS, CORNERSTONE GROUP HOLDINGS, INC., and CORNERSTONE GROUP DEVELOPMENT CORP. to enjoin Defendants from discriminating against Plaintiffs herein, and preventing discrimination to other persons with disabilities in all of their premises in the future as follows:

a. That the Court declare that the actions of the Defendants violated the Fair Housing Amendments Act by discriminating against families with children;

b. That the Court enjoin Defendants from discriminating against Plaintiffs or any other person, because of because of their familial status;

c. That the Defendants allow DONNA WEISSINGER and TERRI MILSAP, to rent apartments free from discrimination;

d. An award of appropriate compensatory and punitive damages to TERRI MILSAP, DONNA WEISSINGER, and their children, and all persons similarly situated against Defendants to compensate them for their actual damages and for the

humiliation, embarrassment and emotional distress cause by the Defendants' discriminatory actions;

e.  An award of appropriate compensatory and punitive damages to JENNIFER TOOLEN, her children, and all persons similarly situated against Defendants to compensate them for their actual damages for the additional rent paid and for the humiliation, embarrassment and emotional distress cause by the Defendants' discriminatory actions;

f.  An award of appropriate compensatory and punitive damages to Plaintiff HOUSING OPPORTUNITIES PROJECT FOR EXCELLENCE, INC. and against Defendants to compensate it for the drain on its resources that can be reasonably attributed to the frustration of H.O.P.E., INC.'s purpose of enforcing the Fair Housing laws in Florida and to educate the public to combat the effects of the discrimination perpetrated to such victims of housing discrimination;

g.  That the Court declare that the Defendants acts' were willful and wanton and in reckless disregard of the Plaintiffs' civil rights under law;

h.  Order Defendants to provide a notice to all tenants with children for all buildings owned and/or controlled by the Defendants, their rights under the Fair Housing Act, including their right to have more than one child per room;

i.  Order Defendants to establish uniform and objective policies and procedures developed by H.O.P.E., INC. to be used in establishing occupancy limitations for all buildings owned and/or controlled by the Defendants;

j.  Establish a common fund to be administered by H.O.P.E., INC. to compensate all victims of familial discrimination for additional rent incurred;

k.  Order that the Defendants instruct all of its employees, agents, independent contractors and/or other persons who deal with the rental or management of any and all housing currently owned, managed and/or controlled by Defendants, of the terms of the Court's Order and the Fair Housing Act, Fair Housing Act and implementing regulations.

l.  Order that the Defendants shall maintain for inspection by Plaintiffs and all other tenants at its rental offices, copies of the Fair Housing Act, Fair Housing Amendments Act and implementing regulations.

m.  Order that for the three-month period beginning on the date this Court's Order becomes final and for each consecutive three-month period thereafter, for a period of three years, Defendants shall submit to H.O.P.E., INC., reports containing the information regarding the familial status of all tenants residing at Sanctuary Cove;

n.  Find that Plaintiffs are entitled to an award of attorneys' fees and costs, and reserve ruling as to the amounts and the applicable multiplier until the conclusion of the trial on this matter;

o.  And grant any other such relief as this Court deems just and equitable.

**B - Violation of the Florida Deceptive and Unfair Trade Practices Act**

82.  The Plaintiffs reallege and incorporate by reference paragraphs 1 through 66 as if alleged herein.

83.  In acting as herein alleged, Defendants have engaged in a pattern or practice of unlawful discrimination in the operation of the multi-family residents operated by CORNERSTONE GROUP and therefore have engaged in deceptive and unfair trade practices.

Law Offices of Matthew Dietz, P.L.*999 Ponce de Leon Blvd*Suite 735*Coral Gables, Florida 33134

84.    Further, Defendants' actions in supplementing rental requirements for low-income tenants to deprive such tenants the value afforded by their vouchers is further unfair and deceptive.

85.    Defendants should be required to disgorge any profits gained by such illegal, deceptive and unfair trade practice, as well as an injunction to enjoin further illegal and discriminatory practices.

86.    These actions are unfair and deceptive as defined under the Florida Deceptive and Unfair Practices Act, § 501.204, Fla. Stat., and Plaintiffs were damaged by Defendant's deception.

87.    Plaintiffs have retained the services of The Law Offices of Matthew W. Dietz, P.L., and have agreed to pay them a reasonable fee for services in the prosecution of this cause, including costs and expenses incurred in this action, Plaintiffs are entitled to recover those attorneys fees, costs and expenses from Defendant pursuant to Florida Statute § 501.2105.

88.    Pursuant to Florida Statute § 501.211, the court may issue an order prohibiting the discriminatory practice and provide actual damages, and punitive damages.

WHEREFORE, the Plaintiffs demands judgment against the Defendant for injunctive relief, compensatory damages, punitive damages, pre-judgment interest, post judgment interest, attorney's fees, and such further relief as this Court deems just and equitable.

**THE PLAINTIFFS DEMAND A JURY TRIAL FOR ALL SUCH ISSUES SO TRIABLE IN THIS MATTER**

Scanned Image - 0:05CV60033 Document 29 page 32 Fri Feb 25 13:38:45 2005

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of the foregoing was sent via U.S.

Mail to Counsel for the Defendants, Leslie Langbein, Esq., 8181 NW 154th Street, Suite 105,

Miami Lakes, Florida 33016, this 22nd day of February, 2005.

LAW OFFICES OF MATTHEW W. DIETZ, P.L.
999 Ponce De Leon Blvd. Ste 735
Coral Gables, Florida 33134
Phone (305) 669-2822
Facsimile (305) 442-4181
E-Mail: Matthewdietz@usdisabilitylaw.com

MATTHEW W. DIETZ, ESQUIRE
FL. BAR NO.: 0084905